DECISION
Plaintiff appeals the 2008-09 real market value of improvements identified as Account 05003168 (Tax Lot 3600).
A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on August 29, 2011, and August 31, 2011. Donald Grim, Attorney at Law, appeared on behalf of Plaintiff. Sonya Johnson (Johnson), Plaintiffs Controller and John Taylor (Taylor), broker and certified appraiser, testified on behalf of Plaintiff. Kathleen Rastetter, Senior County Counsel, appeared on behalf of Defendant. Cheryl Gordon (Gordon), MAI, Oregon and Washington certified general appraiser and Clackamas County Staff Appraiser, testified on behalf of Defendant. Parties stipulate that Taylor and Gordon are expert witnesses.
Plaintiffs Exhibits 1, 2, 3, and 8 through 13 were received without objection. Defendant's Exhibits A through K were received without objection.
Defendant's Trial Memorandum, filed August 26, 2011, included a motion in limine. Because Plaintiff did not offer into evidence the exhibits that were the subject of Defendant's motion in limine, Defendant's motion in limine is moot. *Page 2 
 I. STATEMENT OF FACTS
The trial for the above-entitled matter was held at the same time as a related matter, Village at Main Street v. Clackamas CountyAssessor, TC-MD 070501D (Control). Relevant facts for the above-entitled matter can be found in TC-MD 070501D. For the 2008-09 tax year, Plaintiff presented no evidence or testimony; Plaintiffs evidence and testimony set forth in TC-MD 070501D is for tax year 2006-07.
On behalf of Defendant, Gordon testified, stating that her determination of value was based on three approaches to valuation.
A. Cost Approach
Gordon's cost approach was set forth in TC-MD 070501D. For tax year 2008-09, Gordon concluded $18,018,000 for improvements. (Def s Ex A-54.)
B. Comparable Sales Approach
1. Price per unit
Gordon testified that she selected six comparable properties and two of her comparable properties (Sale #2, Courtland Village located in Hillsboro, Oregon, and Sale #6, Town Center Park Apartments, Wilsonville, Oregon) were the same as Taylor's comparable properties identified as Sale #5 and Sale #4, respectively. (Def s Ex A-73,74.) Both Gordon and Taylor computed the same sale price per unit for Town Center Park Apartments ($83,784), but a different sale price per unit for Courtland Village ($86,806 compared to $131,944). (Ptf s Ex 2-18; Def s Ex A-79.) For Courtland Village, Taylor relied on the September 2005 sale and Gordon relied on the November 2007 sale. (Ptf s Ex 2-18; Def s Ex A-72.) The unit size of Gordon's six comparable properties ranged from 111 units to 390 units, resulting in a range of sale price per unit of $71,282 to $120,833. (Def s Ex A-72, 74.) Gordon testified that she *Page 3 
selected comparable properties that were most similar in size, "age, amenities and income potential" to the subject property. Gordon testified that "[g]iven the subject units are new construction, a price per unit above the average [$107,343] is warranted. For this unadjusted analysis, an above-average indicator of $115,000 per unit is concluded for the subject units when applied to the 208 units results in a price per unit of $23,920,000." (Id. at 79.) (emphasis in original).)
2. Price per square foot
Using six comparable properties, Gordon determined that "the comparables range[d] from $76 to 145 per SF." (Def's Ex A-79.) In discussing price per square foot, Gordon's appraisal report stated:
 "The high end of $145 is for the property with the smallest average unit size (836 SF) which is reflective of the inverse relationship between size and price. The largest size units (1,000+ SF) are at the lower end of the range. The subject average unit size of 921 SF is mid-range of the comparables, suggesting a price near the average of $125 per SF. Given new construction, a price above the average is warranted."
(Id.) Gordon determined that applying [$125 per square foot] "to the net rentable area of 191,625[1] SF results in price per SF indicator of $23,953,125 for the subject property." (Id. at 80.)
3. Gross potential income multiplier
Gordon included her Gross Potential Income Multiplier (GPIM) analysis with the Sales Comparable Approach. (Id.) Gordon's appraisal report stated:
 "The comparable sales have generally similar unit mixes to include one, two and three bedroom walk-up flats. Unit features (patios/decks, washer/dryer machines) and project amenities (pools, fitness center, and clubhouse) are generally similar to the subject and reflect similar income earning potential. Given these *Page 4 
similarities, applying a GPIM to the forecast gross income is a reliable method. * * * The comparables indicate a range of GPIMs from 8.31 to 11.43 with an average of 10.20. A near average multiplier of 10.00 is concluded for the subject property. When applied to the forecast gross potential income of $2,649,168 results in a value indicator of $26,491,680 for the subject property."
(Id.) (emphasis in original).)
After considering the price per unit indicator, price per square foot indicator and GPIM indicator, Gordon concluded a real market value of $24,000,000. (Id. at 81.)
C. Income Approach
Gordon's appraisal report stated that the historic reported income for 2006 for "Apartment Rentals, Garage Rentals, Carport Rentals, Pet/A.C. Rent, Fees/Deposits and Utility Billings" was $445,511. (Def's Ex A-57.) Gordon undertook a rent survey using five apartment complexes that she identified as comparable to the 208 unit apartment complex. (Id. at 58.) In addition to including Canyon Creek Apartment and Wilsonville Summit in her survey, Gordon included three other apartment complexes located in Wilsonville: Madison Boulder Creek Apartments, Town Center Park Apartments, and Hathaway Court Apartments. (Id.) Gordon compared actual effective rate for each unit, specifically type and size (one bedroom and one bathroom, measuring 645 square feet; two bedroom and one bathroom, measuring 810 square feet; two bedroom and two bathroom, measuring 1,045 square feet; and three bedroom and two bathroom, measuring 1,181 square feet), to the "owner's projected average `street rate.'" (Id. at 65.) Based on that comparison, Gordon determined "forecast rents" for the 208 units. (Id.) Gordon testified that she did not "use Phase1 rents" to eliminate any "bias." She testified that she concluded "rents reasonable within market parameters." Gordon forecast other income consisting of fees, deposits, utility reimbursements and undefined miscellaneous to be $220,764 per month. (Id. at 66.) *Page 5 
In determining a vacancy and collection loss deduction, Gordon considered information reported by "competing properties, * * * local brokerage publications, and investor parameters." (Id.) Gordon noted that "[b]ased on rent rolls provided, 162 of the 208 units were leased at year-end 2007 for an indicated occupancy level of 78%. Stabilized occupancy by market standards is defined as 95% occupancy." (Id.) Gordon concluded that "for this stabilized analysis, a typical 5.00% vacancy and collection loss is applied to gross potential income." (Id.)
Gordon relied on the owner's reported expenses for 2009 in computing operating expenses because "these figures are reflective of stabilized expenses." (Id.) In her appraisal report, Gordon stated that "[f]orecast expenses total $748,368 or 33.25% of gross potential income. Forecast expenses are generally similar as reported by the owner." (Id. at 68.) After deducting vacancy and operating expenses, Gordon computed a net operating income of $1,768,342. (Id.) Gordon testified that she concluded that the "2009 stabilized income per unit rather than per square foot" is "comfortably close to actual."
To the net operating income, Gordon applied an overall capitalization rate. She described that capitalization rate as "a `loaded' market rate which is based upon the applicable tax code and change ratio." (Id.) Gordon used the same six comparable sales that were selected for her "Sales Comparison Approach." (Id.) "The six sales establish an OAR range of 5.42% to 6.38%" with an average of 5.92%. (Id. at 69.) Noting that "[t]he subject property is new construction, has above average amenities and is well-located," Gordon concluded that a "market OAR of 6.25% is a reasonable rate for the subject property." (Id.) (emphasis in original).) Gordon testified that a capitalization rate "in the fives is too low" for a "property of this size." To the 6.25 percent capitalization rate, Gordon added "the applicable 2008 tax code rate of 1.80039 * * * multiplied by the change ratio adjustment to the date of value, or 0.670" for a property tax rate of 1.20626. *Page 6 
(Id.) Gordon concluded that the "loaded OAR" was "7.4563%." (Id.) (emphasis in original).)
Gordon's appraisal report stated:
 "Dividing the estimated net operating income of $1,768,342 by 7.45% results in a value indication of $23,716,205 rounded to $23,715.000."
(Id.) (emphasis in original).)
D. Land real market value
To determine an improvement real market value, Gordon deducted the land real market value of $6,854,000 (rounded). (Id. at 48.) Gordon's real market value was a total of a raw land real market value of $3,952,000 and on-site development costs of $2,901,951. (Id.)
In making her determination of raw land real market value, Gordon concluded that the "Sales Comparison Approach" was "the best and most applicable method of estimating land valuation." (Id. at 41.) She relied on six comparable sales "occurring from 2004 through 2007." (Id.) Gordon concluded that "[p]arcel size is a critical element of comparison. * * * The five sales range from 9.30 to 19.40 acres as compared to the subject size of 12.10 acres. On a parcel size basis, the comparables are appropriate and reasonable for comparison to the subject parcel." (Id. at 45.) Gordon concluded that "[t]he range of density established by the comparables (17.53 to 29.68) is appropriate and reasonable for direct comparison to the subject parcel." (Id.) Gordon's final consideration was price per unit basis. (Id.) She concluded that "the comparable sales establish a reasonable and tight range of value indicators for the subject parcel. The overall average is $16,033 per unit. Primary consideration is given to the two most recent sales ($18,932 and $19,324.)" (Id. at 46.) Gordon concluded that "a price per unit value of $19,000 per unit" was appropriate and "applied" that per unit value "to the 208 allowed units" for a raw "land value conclusion of $3,952,000." (Id.) *Page 7 
To the raw land real market value, Gordon added on-site development costs. Gordon testified that she concluded only $4,213,409 of the total OSDs ($7,208,509) are allowable OSDs that can be allocated on a per unit basis ($13,952) and added to the raw land cost. (Id. at 47.) Gordon testified that the municipal development fees that she did not attribute to the land are "clearly required for the development of the 207 (sic) units, [but] are more accurately classified as indirect, or `soft' construction costs relating to the buildings and proposed occupancy." (Id.) She concluded that "[b]ased on the 208 units * * *, the indicated site development cost is $2,901,551. (Id.)
E. Reconciliation
Gordon testified that after determining real market value using the "three most applicable methods to valuation," the "three indicators vary by less than two percent." (Id. at 82.) She concluded that because the subject property was "a large income-producing investment grade property and is marketable in conjunction with an earlier phase, the Income Capitalization Approach is the most applicable method of valuation" and "primary weight is assigned to the Income Capitalization Approach." (Id.) Gordon concluded an improvement real market value as of January 1, 2008, of $17,146,000. (Id.)
 II. ANALYSIS
The issue before the court is the 2008-09 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. SeeRichardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads: *Page 8 
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year.
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2) and OAR 150-308.205-(A)(2).
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev., 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property."Poddar v. Dept. of Rev., 18 OTR 324, 332 (2005) (quotingWoods v. Dept. of Rev., 16 OTR 56, 59 (2002) (citation omitted). Plaintiff provided no evidence of the subject property's real market value as of the assessment date, January 1, 2008.
Even though Plaintiff failed to carry its burden of proof and to then shift that burden to Defendant, this court "has jurisdiction to determine the real market value or correct valuation [of property] on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant's expert witness, Gordon, determined an improvement real market value using the three valuation approaches: cost, sales and income. Gordon concluded that primary weight should be given to the income approach and the court agrees that, because the subject property is an income producing property, the most applicable approach is the income capitalization approach. The court concludes that, given the narrow spread among *Page 9 
Defendant's three approaches used to determine the subject property's real market value, the court accepts Defendant's income capitalization approach real market value of $23,715,000.
To determine an improvement real market value, the land real market value must be subtracted from the real market value of $23,715,000 determined by the income capitalization approach. The court accepts Gordon's sales comparison approach and determination of raw land real market value of $3,900,000.
To the raw land real market value, Gordon added on-site development costs. The court disagrees with Gordon's on-site development costs of $13,952 per unit. (Id. at 47.) As previously stated in the court's Decision for TC-MD 070501D, the court concluded that an additional $3,977 per unit must be added to Defendant's per unit ($13,952) on-site development cost. For the 208 units, total allowable on site development costs are $3,729,000 (rounded).
The court concludes that the land real market value (raw land and on-site improvements) as of the assessment date is $7,629,000.
After adjusting the land real market value, the court concludes that the improvement real market value as of January 1, 2008, is $16,086,000.
The improvement real market value determined by the court is greater than the real market value ($12,447,490) stated by the Clackamas County Board of Property Tax Appeals Order, dated April 1, 2009. The result is that there will be no change in Plaintiffs property taxes for tax year 2008-09 as a result of the court's determination.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. The court's determination of the subject property's / / / *Page 10 
real market value is based on Defendant's testimony and written evidence adjusted as noted above. Now, therefore,
IT IS THE DECISION OF THIS COURT that, because the court's determination of improvement real market value results in no change to Plaintiffs 2008-09 property tax assessment, Plaintiffs appeal is denied.
Dated this ____ day of December 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron December 13, 2011. The Court filed and entered this documenton December 13, 2011.
[1] Taylor determined a net rentable square footage for the 208 units of 190,344. (Ptf's Ex 2-18, 20.) The parties offered no testimony about their differences in net rentable square footage.
[2] All references to the Oregon Revised Statutes (ORS) are to year 2007. *Page 1